IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:24-cr-28-007 |
| | ) | |
| LUIS GUSTAVO DIAZ, | ) | |
| | ) | |
| Defendant. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING AND MOTION FOR ACCEPTANCE OF RESPONSBILITY DECREASE

The United States of America, by and through its attorneys, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, Kristen S. Taylor, Assistant U.S. Attorney, and Ben Tonkin, Trial Attorney, United States Department of Justice, Violent Crime & Racketeering Section, offers the following with respect to the sentencing factors under 18 U.S.C. § 3553(a) and the U.S. Sentencing Guidelines ("USSG" or "guidelines") for defendant Luis Gustavo Diaz (hereinafter, "the defendant").

There are currently no outstanding objections to the defendant's Presentence Investigation Report.

The PSR's advisory guideline range is 51 to 63 months of imprisonment, resulting from a total offense level of 24 and a criminal history category of I. *See* Dkt. No. 242 (Final Pre-Sentence Investigation Report) (hereinafter, "Final PSR" or "PSR") at ¶¶ 78-79. The government submits that a sentence within the advisory guidelines range would be sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

I.   **Procedural Background**

On April 17, 2024, the defendant was charged in a two-count Indictment charging him with Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, in violation of 18 U.S.C. § 1962(d), and Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. §§ 1956(a)(1)(ii) and (h).  PSR ¶ 1.

On December 11, 2024, the defendant pled guilty to Count one of the Indictment, pursuant to a plea agreement. PSR ¶ 2.

On March 5, 2025, the U.S. Probation Office ("USPO") filed the initial PSR, which calculated the defendant's total offense level as 24 and his criminal history category as I, resulting in a guidelines range of 51-63 months. *See* Dkt. No. 237.

On March 25, 2025, the government requested that the probation office supplement the initial PSR with additional information, including information related to the defendant's 2016 encounter with law enforcement at a gas pump in Brewer, Maine, and his 2016 arrest for theft in Bal Harbor, Florida. Neither party advised of any formal objections to the PSR.

On March 28, 2025, the USPO disclosed the Final PSR (*see* Dkt. No. 242), which included the information related to the defendant's prior contact with law enforcement. PSR ¶¶ 53-54.  The government has no objections to the Final PSR.

II.  **Motion to Grant the Defendant Additional One-Level Decrease for Acceptance of Responsibility**

The defendant has assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.  USSG § 3E1.1(b).  The PSR has properly applied a two-level decrease in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and

2

the defendant's offense level prior to the operation of that section is level 16 or greater. Accordingly, the United States moves this Court to apply an additional one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b). This reduction is already reflected in the PSR's offense level calculation. PSR ¶ 44.

### III. Standards Governing Sentencing

In fashioning a criminal sentence, a district court must "first calculate the applicable [U.S. Sentencing] Guidelines range." *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). After calculating the guidelines range, the district court "must give both the government and the defendant 'an opportunity to argue for whatever sentence they deem appropriate.'" *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). The district court must then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether those factors support the sentence requested by either party. *Id*. (citing *Gall*, 552 U.S. at 49). The court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

In the event that the district court imposes a sentence outside the guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Pauley*, 511 F.3d at 473 (quoting *Gall*, 552 U.S. at 50). After deciding an appropriate sentence, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50. The Fourth Circuit has also held that "a sentencing court must address the parties' nonfrivolous arguments in favor of a particular sentence, and if the court rejects those arguments, it must explain why in a sufficiently detailed manner to allow this Court to conduct a meaningful appellate review." *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017).

The Fourth Circuit considers "[a] within-Guidelines range sentence [] presumptively reasonable." *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017).

**IV.    The Statutory Sentencing Factors**

A.  <u>The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))</u>

The defendant was a member of a criminal enterprise that engaged in gas pump skimming operations throughout the United States. PSR ¶ 25. Gas pump skimming operations include but are not limited to scouting locations for installation of skimming devices, monitoring skimming devices, retrieving track data from skimming devices, creating cloned credit and debit cards using track data from skimming devices, cash out operations, and using fences to exchange illicit goods for cash. *See id*. The defendant was a member of the enterprise beginning in or about May 2018 and continuing through in or about March 2019. *See id*. While a member of the enterprise, the defendant took numerous trips to conduct skimming operations as defined above. *See id*. Some of these trips are outlined in the 18 overt acts included in the defendant's statement of facts. *See* Dkt. No. 176 at ¶¶ 32-49.

These overt acts illustrate the wide range of the defendant's involvement in the activities of the enterprise. For example, the defendant traveled from Miami to various locations, including California, Washington, Arizona, and Illinois to conduct skimming operations, on one occasion transporting $150,000 in skimming proceeds from California to Arizona. PSR ¶ 25; *see also* Dkt. No. 176 at ¶¶ 32, 33, 42, 45, and 47. He and his co-conspirators used cell phones and other electronic devices to search for businesses where they could conduct cash out operations and drove around scouting locations to install skimming devices on gas pumps. *See id*; *see also* Dkt. No. 176 at ¶¶ 34 and 44. The defendant and his co-conspirators used cloned cards to conduct cash-out operations, and then transported fraudulently obtained gift cards, cash, and other goods over state

lines back to Miami. *See id*; *see also* Dkt. No. 176 at ¶¶ 35, 41, 45, and 48. This conduct was repeated over and over again during the course of approximately 10 months. *See id; see also* Dkt. No. 176 at ¶ 50. Approximately $2.43 million in losses are attributed to the defendant based on approximately 4,879 unique card numbers traded among e-mail accounts attributable to the enterprise during that time frame.

While records of the enterprise's travel, internet searches, and email correspondence provide a broad overview of their conduct, a closer look at the group's conduct on the Eastern Shore provides a more detailed view of the damage the defendant and his coconspirators caused. In April 2018, law enforcement located and retrieved skimming devices placed by members of the enterprise at two gas pumps in Northampton County. The investigation revealed that from April 21, 2018 to April 22, 2018, the defendant's coconspirators hit at least 19 different locations (18 of which were located in the Eastern District of Virginia), mostly Harris Teeter grocery stores, to conduct cash-out operations. *See* Government Exhibit 1. In approximately one-months' time, members of the Enterprise generated well-over $100,000 in actual/attempted loss, typically by purchasing $500 gift cards or making cash-back transactions of hundreds of dollars. *See id*. These figures, relative to the full extent of the Enterprise's conduct throughout the country, in addition to the defendant's meaningful involvement in the Enterprise's nationwide efforts, justifies a substantial sentence within the advisory guideline range.

B. <u>The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>

The defendant is 40 years old and was born in Camaguey, Cuba, where he lived until 2011. PSR ¶ 56. He was raised by his mother, with help from other family members. PSR ¶ 58. The defendant reports having grown up in a calm environment, where his basic needs were met. PSR ¶ 57. The defendant further reports no history of physical, emotional, or sexual abuse. *See id*.

5

At the time of his arrest, the defendant lived with family in Miami, including his mother, maternal half-brother, long-term partner, and 5-year-old child. PSR ¶¶ 57, 60, and 63. The defendant also has a 14-year-old son from a prior relationship who lives in Spain. PSR ¶ 61. He has no court-ordered financial obligations as to either child.

The defendant is a lawful permanent resident of the United States. PSR ¶ 59. He has reported no history of alcohol or substance abuse. PSR ¶ 67. The defendant does not report any major health issues. He suffers from asthma and a crab allergy, for which he receives medication in local custody. PSR ¶ 65. The defendant's mother also reported that he was diagnosed with epilepsy and was prescribed medication for the same. PSR ¶ 58.

Since 2015, the defendant reported having been self-employed. PSR ¶¶ 70-71. From May 2022 to present, the defendant reported being the owner of Winstar, LLC, a trucking logistics company, in Miami, Florida. PSR ¶ 70. He advised that Winstar, LLC currently earns approximately $8,000.00 monthly and his long-term partner is operating the business while he is incarcerated. *See id*. The defendant's long-term partner also advised that she owns JWCO LLC. *See id*. At the time of the filing of the defendant's pretrial services report, the defendant reported that Winstar, LLC earned approximately $20,000 per month and estimated the total value of the company at $800,000. *See id*. In the PSR, the defendant reports a negative monthly cash flow exceeding $7,000. PSR ¶ 73. Online searches of Winstar LLC and JWCO LLC reveal that both entities exist but neither the defendant nor his long-term partner are listed as registered agents. *See id*.

The PSR reflects a criminal history score of zero, resulting in a Criminal History Category I. PSR ¶¶ 49-50. Accordingly, the defendant technically meets the criteria for a two-level reduction pursuant to U.S.S.G. USSG §§ 4C1.1(a)(1)-(10). PSR ¶ 45.

6

That said, while the defendant has no prior qualifying *convictions*, this Court should consider that his record is by no means devoid of criminal conduct and/or meaningful contact with law enforcement. His prior 2020 conviction from Placer County correctly received no criminal history points because it was related to the instant offense. PSR ¶ 48.

Notably, however, in 2016, the defendant was observed by police in a dark colored SUV at a gas station closed for the evening. PSR ¶ 54; *see also* Government Exhibit 2 (Gov. Ex. 2). The defendant was the driver (operating the vehicle with a suspended Colorado driver's license) and had one adult male passenger in the back seat. *See* Gov. Ex. 2. Law enforcement observed two red Milwaukee toolboxes on the back seat and a laptop sitting on the front passenger seat. PSR ¶ 54; *see also* Gov. Ex. 2. Law enforcement also noticed that the male passenger had a drill in between his legs. *See* Gov. Ex. 2. The drill had a star-shaped bit that the male passenger later attempted to conceal from the officer. *See* Gov. Ex. 2.

Law enforcement further observed that the face of the gas pump was held on by two screws and the heads of the screws had a pattern similar to the drill bit observed in the defendant's vehicle. *See* Gov. Ex. 2. Law enforcement located seven credit/gift cards in the passenger side door, which an officer observed the defendant's passenger remove from his wallet earlier and discard to that location. *See* Gov. Ex. 2. One of the credit cards was in an unidentified individual's name. *See* Gov. Ex. 2. Additional cards were located in both the defendant's and his passenger's wallets. *See* Gov. Ex. 2. The gas pump appeared to have been tampered with, as the face of the pump was partially open, with the top and bottom screws partially fastened. *See* Gov. Ex. 2. The defendant was arrested and charged with Aggravated Criminal Invasion Computer Privacy and Possession or Transfer or Burglar's tools. PSR ¶ 54. These charges were dismissed in 2017. *See id.*

7

The facts included in the PSR and in the attached Gov. Ex. 2 demonstrate first and foremost that the defendant's 10-month stint as a member the Enterprise was by no means his first encounter with skimming activity, and in fact, he had prior experience installing and/or retrieving skimming devices at gas pumps. This conduct, and the defendant's other prior encounters with law enforcement are also significant because criminal history has a direct correlation with risk of recidivism. The Sentencing Commission examined the relationship between rearrests and the total number of criminal history points and confirmed that offenders with more extensive criminal histories had higher rearrest rates. *See Recidivism of Federal Offenders Released in 2010* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf (hereinafter, "Recidivism Report") at pp. 25-28.

> In its 2016 Recidivism Overview Report and its 2017 Recidivism Criminal History Report, the Commission reported the lowest recidivism rates among offenders with zero criminal history points (30.2%), a sharp increase for offenders with one criminal history point (46.9%), and a generally steady increase in recidivism with each additional criminal history point.

Recidivism Report at p. 27, n. 72 (citing 2016 Recidivism Overview Report, supra note 3, at 18; 2017 Recidivism Criminal History Report, supra note 8, at 7). Also, notably, "one-fifth (20.3%) of zero-point offenders with no prior contact with the criminal justice system were rearrested during the study period." *Id* at p. 28. "In comparison, nearly one-third (32.7%) of zero-point offenders with prior contact were rearrested." *Id*. All this suggests that prior contact with law enforcement matters when it comes to evaluating the likelihood of recidivism.

The defendant's history and characteristics, therefore, support the government's request for a guideline sentence.

C. <u>The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))</u>

The sentence imposed must adequately capture the seriousness of the offense conduct in this case, promote respect for the law, and provide just punishment. To do so, this Court must consider the impact the criminal enterprise, of which the defendant was an active and fruitful member, had on law-abiding citizens throughout this district and all over the country. The enterprise charged in this case employed sophisticated tactics that enabled them to systematically and covertly steal from thousands of unwitting individual victims pumping gas in their hometowns or traveling interstate.

This Court should consider the effect of one's identity being compromised on an individual victim, let alone thousands of victims over a sustained period of time. The enterprise charged in this case made a living at others' great expense. Furthermore, the way in which the enterprise operated made them very difficult to detect by local law enforcement agencies, which explains why it took a federal RICO prosecution to capture the nationwide scope of its conduct. This also means that the conduct captured by this case is largely historical, which makes identifying individual victims for purposes of restitution at best very difficult, and at worst, impossible. The defendant and his co-conspirators' sentences must account for all these considerations.

D. <u>The Need to Afford Adequate Deterrence & to Protect the Public from Further Crimes (18 U.S.C. § 3553(a)(2)(B), (C))</u>

General deterrence should be a significant factor for this Court's consideration in this case. The large-scale theft of individuals' personally identifiable information through gas pump skimming is an ongoing problem throughout the country, and the prevalence of credit card fraud and its impact on both individual victims and financial institutions cannot be overstated. Sixty-two percent of credit card holders have been victimized by fraud, with annual losses exceeding $6.2 billion annually. *See* Brett Cruz, *2025 Credit Card Fraud Report and Statistics*, Jan. 27, 2025,

9

https://www.security.org/digital-safety/credit-card-fraud-report/. Yet, fraudsters like the defendant often go unpunished: only 10 percent of fraudulent charges are actually reported to law enforcement. *See id.* As discussed above, this type of conduct largely goes unadjudicated, in part, because the actors move in and out of locations quickly to avoid detection by law enforcement, making it very difficult for local law enforcement agencies to make victims whole. This defendant's sentence must be substantial enough to send a message to those engaged in similar conduct that if caught, the penalties will be severe.

And while general deterrence should be a primary concern, it also appears that specific deterrence should be a factor for this Court's consideration. Recall that the defendant previously engaged in skimming activity, was encountered by law enforcement and charged in 2016, only to have those charges dismissed in 2017. Approximately one year later, *completely undeterred*, he joined the Enterprise and successfully began engaging in the same criminal activity. This repetitive conduct demonstrates a need for specific deterrence and a need to protect the public from future financial crimes committed by this defendant.

E. The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))

The available statutory sentence for Count One, a violation of 18 U.S.C. § 1962(d), is up to 20 years of imprisonment. *See* 18 U.S.C. § 1963(a). A sentence of probation is not authorized by the guidelines but is statutorily authorized for not less than one and up to five years. 18 U.S.C. § 3561(c)(1). A term of supervised release may be imposed for up to three years. 18 U.S.C. § 3583(b)(2).

F. The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(6))

The government is requesting a sentence within the advisory guidelines range, which would serve to avoid unwarranted disparities with similarly situated defendants. *See United States*

*v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) ("The purpose of the sentencing guidelines is 'to eliminate disparities among sentences nationwide.'" (quoting *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008))); *United States v. Parks*, Criminal Action No. 5:05-CR-00257-KDB-DCK, 2020 WL 6826214, at *3 (W.D.N.C. Nov. 20, 2020) ("One of the goals of the Sentencing Guidelines is to avoid national sentencing disparities amongst similar offenders with similar criminal conduct. *See, e.g.*, *United States v. Johnson*, 445 F.3d 339, 343 (4th Cir. 2006). Thus, the best way to avoid unwarranted sentencing disparities is for the district court to impose a sentence within the guidelines range.").

As reflected in the PSR, nine individuals were previously convicted of Conspiracy to Commit Bank Fraud in a related matter. *See US v. Pedro Duran, et al*., 2:19-cr-109; PSR ¶¶ 13-21. This related matter involved members of the same criminal organization who traveled to the Eastern District of Virginia in or about April 2018 to conduct a skimming operation.

The individuals who pled guilty in the previous case were charged with approximately one months' worth of skimming activity. Unfortunately, at that time, law enforcement was unaware of the far-reaching scope of the organization's activities. Despite spending only a short time here in EDVA in April 2018, the defendant's fellow enterprise members charged in *US v. Duran et al.* managed to generate a significant amount of loss, ranging from approximately $245,000 to $570,000, depending on each individual defendant's involvement. The nature of the previous investigation also enabled law enforcement to tie specific transactions using victims' PII to individual defendants, making it much easier to reliably calculate loss.

Yasmani Qujiada, one of the enterprise's leaders, was convicted and sentenced to a total of 10 years' incarceration in the previous case. He was attributed with over $5,000,000 in loss, based on calculations from individual victims from the EDVA skimming trip and over 9,000 unique card

11

numbers identified in an e-mail account that was associated with him. Notably, the previous investigation included seizures of at least two laptops – one containing **642 unique access devices** (**totaling $321,000 in losses**) and one containing **212 unique access devices** (**totaling $106,000 in losses**).

The significant takeaway from the previous investigation is that the losses in the instant case are conservatively calculated. The previous case generated a snapshot of the damage this organization could do in one location over a short period of time. That said, the sentences imposed in the previous case, despite being based on only one skimming trip, were in most instances fairly significant given their advisory guideline ranges and the individual loss amounts attributable to them.

This case, on the other hand, captures the entirety of this criminal organization's conduct. A RICO conspiracy is designed to punish not only the individual acts of racketeering charged, but the existence of organized criminal activity. "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961). Thus, organized crime poses a significant threat to our community, not just physically, but financially. Here, additional investigation has revealed that the scope of the enterprise was much larger than previously known. During the defendant's tenure, the enterprise transmitted just under 5,000 unique set of stolen card data. The sentences imposed for members of this enterprise engaged in organized financial crime, the consequences of which were nationwide, must adequately capture the scope of their conduct. Therefore, given these considerations, a guideline sentence for this defendant is more than reasonable.

    G.   <u>The Need to Provide Restitution (18 U.S.C. § 3553(a)(7))</u>

In the plea agreement, the defendant agreed that restitution was mandatory, and to the entry of a restitution order in the full amount of the victim's losses. Dkt. No. 175 at ¶ 10. Furthermore, as part of the plea agreement entered in this case, the defendant agreed that the Court may defer the imposition of restitution until after sentencing and specifically waives the 90-day provision found at Section 3664(d)(5) and consents to the entry of any orders pertaining to restitution after sentencing without limitation. *See id*. To-date the government is still working with victim-witness services to identify victims and finalize figures attributable to the conduct committed by the defendant and his co-conspirators, not otherwise accounted for by previous Restitution Orders entered in related cases.

Therefore, the government requests that the Court bifurcate restitution in this matter pursuant to 18 U.S.C. § 3664(d)(5), which allows restitution to take place within 90 days after the sentencing hearing. If the Court grants this request, the government further requests that this Court address at the sentencing hearing whether the defendant will waive his presence at any subsequent proceeding(s) regarding restitution. If he does not, then the government would request that he remain in local custody and not be transferred to the BOP until restitution is finalized.

**V.**   **Supervised Release Conditions**

To comply with the Fourth Circuit's decision in *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), and *United States v. Singletary*, 984 F.3d 341 (4th Cir 2021), the government requests that the Court orally pronounce all conditions of supervised release other than those specifically designated as mandatory under 18 U.S.C. § 3583(d). In addition to an oral pronouncement of the individual conditions, compliance with *Rogers* may be achieved by oral reference on the record to another document, such as the PSR. *Rogers*, 961 F.3d at 299. Here, the U.S. Probation Office has

outlined its recommended supervised release conditions on pages 21 through 24 of the PSR, including mandatory, standard, and special conditions. In addition to those conditions, the government requests a condition prohibiting the defendant from obtaining employment where he would have access to the PII of others.

**VI.   Conclusion**

For the reasons stated above, the government submits that a sentence within the advisory guideline range would be sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Erik S. Siebert
United States Attorney

By:       /s/
Kristen S. Taylor
Assistant United States Attorney
Pennsylvania State Bar No. 326039
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. - 757-441-6331
Fax - 757-441-6689
E-mail Address – Kristen.taylor2@usdoj.gov

       /s/
Ben Tonkin
Trial Attorney
Violent Crime & Racketeering Section
U.S. Department of Justice
Washington, DC 20530
Tel. - 202-514-3594
E-mail Address – Ben.Tonkin@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record who are users of the CM/ECF system.

I further certify that on April 4, 2025, I will send an electronic copy of the foregoing to the following:

Stephanie Hollier
United States Probation Officer

/s/
Kristen S. Taylor
Assistant United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. - 757-441-6331
Fax - 757-441-6689
E-mail Address – Kristen.taylor2@usdoj.gov