# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF VIRGINIA
# Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 2:24cr28-007 |
| ) | The Hon. John A. Gibney, Jr. |
| LUIS GUSTAVO DIAZ, ) | Sentencing Date: 4/18/25 @ 12 p.m. |
| ) | |
| Defendant. ) | |

## DEFENDANT'S POSITION ON SENTENCING

COMES NOW, the Defendant, Luis Gustavo Diaz, by and through counsel, and pursuant Rule 32 of the Federal Rules of Criminal Procedure and this Court's policies and procedures regarding sentencing, states that he has received and reviewed a copy of the Presentence Investigation Report ("PSI") filed in this case with counsel and has no unresolved objections or corrections thereto, including to the guideline calculation contained therein as set forth below, although he does request adjustment and departure as set forth below. In consideration whereof, as well as of 18 U.S.C. §3553(a) ("3553"), the United States Sentencing Guidelines ("USSG" and/or "Guidelines"), *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005) and its progeny, Mr. Diaz respectfully presents his Position on Sentencing as set forth below:

## APPLICABLE LAW ON SENTENCING

In federal sentencing, the district court is tasked with exercising its broad discretion to impose a sentence that is "sufficient, but not greater than necessary" to achieve the enumerated objectives of criminal sentencing. 18 U.S.C. § 3553(a). In doing so, the court must consider not only the advisory range suggested by the Guidelines, but also of each of the factors laid out in 3553. *See Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Nelson v. United States*, 555 U.S. 350 (2009). The Guidelines cannot replace the court's

1

reasoned consideration and application of all the factors, affording each the weight deemed appropriate. ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . .. The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." (emphasis in original) (citations omitted)); *see also, Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009).

The merely advisory nature of the Guidelines deserves special emphasis where, as here, the applicable range results from an arbitrary linkage to loss amounts that are aggregated and imprecise and account for a laundry list of oft-occurring aggravating factors while failing to take into account "myriad" mitigating factors. *See United States v. Ovid,* 09-CR-216 (JG), 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010); *see also* Ellis, Steer, Allenbaugh. *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 CRIM. JUST. 34, 37 (2011). The mitigating factors related to an individual defendant's state of mind (including knowledge, motive, and intent) and his relative role compared with other defendants, which may be present to a degree that can and should significantly impact the determination of an appropriate sentence, are not properly accounted for by the Guidelines.

Moreover, the fraud guideline as it currently stands was borne of what was often viewed as a *too* lenient approach to white-collar cases, both post- but especially pre-Sentencing Reform Act. *See* Bennett, Mark W. and Levinson, Justin D. and Hioki, Koichi, "Judging Federal White- Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform," (Feb. 21, 2016) IOWA LAW REVIEW, Vol. 102, 2016 ("Bennett, et al.") The resulting effort to "reform" white collar sentencing took the form of near-annual amendments and additions to an increasing list of specific offense characteristics, many of

which are intrinsic to any federally prosecuted fraud. *Id.* As a result of this reform, a fraud that would have carried a 30-37 month sentencing range in 1987, by 2003 fell in the range of 151-188 months. *Id.*

Judge Jed S. Rakoff of the Southern District of New York, which presides over innumerable securities fraud cases, once commented that, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number- crunching than of any rigorous methodology—thus maximizing the risk of injustice." *Id.* He further opined that the fraud guidelines "are no longer tied to the mean of what federal judges had previously imposed for such crimes but instead reflect an ever more draconian approach . . ., unsupported by any empirical data." *Id., citing United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

Judges have called the fraud guideline . . .

> . . . "a black stain on common sense," *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Fredric Bock, J.); "patently unreasonable" and "so run amok that they are patently absurd on their face," *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (Jed S. Rakoff, J.); "of no help;" *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (Nancy Gertner, J.) and both "fundamentally flawed" and "valueless." *United States v. Corsey*, 723 F.3d 366, 377 (2nd Cir. 2013) (U.S. District Judge Stefan R. Underhill, J. sitting by designation).

*Bennett, et al., supra.*

In sum, the fraud guidelines lack of empirical foundation renders the Court's 3553 consideration even more crucial to achieving a just result.

## THE APPLICABLE GUIDELINE RANGE & REQUEST FOR DOWNWARD DEPARTURE/ROLE ADJUSTMENT

Mr. Diaz does not dispute that the range of 51-63 months was properly calculated. However, Mr. Diaz does seek a downward departure on the basis of his role in the offense as well as for circumstances not adequately taken into account by the guidelines.

I.      **USSG § 3B1.1 – Role Adjustment**

This conspiracy lasted for approximately ten (10) years and involved a minimum of sixteen (16) participants. The conspiracy operated nationwide and caused millions in losses over that ten-year period. The participants played varying and specific roles within the conspiracy. There were high-level members who had the most experience and made the most money, manufacturers who built and sold skimming devices, installers who put then into gas pumps, as well as those who retrieved data and created cloned cards. The lowest level members of the conspiracy were responsible for the "cash-out" operations, which consisted of, in Mr. Diaz' case, making purchases with cloned cards, often of gift cards.

While it is arguable that Mr. Diaz did not intentionally engage in conduct comprising "sophisticated means" *himself*, he does not take issue with the probation office's application of the enhancement under USSG § 2B1.1(b)(10)(c) because, although his individual role was rather unsophisticated (i.e., to make purchases), he was present with and while other, more knowledgeable members, "scouted" good locations at which to install the skimmers, and he was generally aware of the overall scheme and how he fell into the structure. Therefore, as he acknowledges and accepts responsibility for being an intentional participant in the scheme, Mr. Diaz refrains from objecting to the enhancement. However, he would submit that his *relative* role—even with respect to the sophisticated means employed by the conspiracy—is substantially less culpable than that of some of his co-conspirators, warranting a role adjustment/downward departure pursuant to USSG § 3B1.1.

In determining whether to apply an adjustment, and if so, whether to apply a "minor" or "minimal" adjustment, the Court undertakes to consider "the totality of the circumstances." USSG § 3B1.1, n.3. While the determination is "heavily dependent" on the

4

facts of the individual defendant's case, there is a non-exhaustive list of factors the court may consider. *Id.* The list, and how the consideration applies to Mr. Diaz, is as follows:

(i) *the degree to which the defendant understood the scope and structure of the criminal activity;*

This conspiracy was far more expansive than Mr. Diaz was aware at the time. While there was an entirely separate "arm" of the conspiracy, led by a counterpart to Mr. Rodriguez (which was prosecuted in this Court in 2019), Mr. Diaz was aware and a part of Mr. Rodriguez' "crew," not anyone else's. And while the general scheme was clear to everyone, Mr. Diaz did not personally know everyone involved and did not even *meet* everyone involved during his relative brief time with the group.

(ii) *the degree to which the defendant participated in planning or organizing the criminal activity;*

Mr. Diaz did not participate at all in planning or organizing the criminal activity. He was a low-level employee working exclusively at the direction of others.

(iii) *the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;*

Mr. Diaz did not exercise any decision-making authority or influence the authority of others.

(iv) *the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;*

As noted above and within the Statement of Facts and PSI, Mr. Diaz' involvement in this conspiracy was limited to traveling around for "cash-out" operations, which occasionally overlapped in timing and personnel with "scouting" operations, though he himself was not a "scout" or an "installer." Of the ten years the conspiracy ran, Mr. Diaz was involved for nine months. He went where he was told, was handed a number of cards and told where to cash them

5

out, and then he brought the proceeds back to higher-ups in the group. He did not have any discretion with regard to where or how he participated. He also often chose not to socialize with the group in the evenings on trips, sticking close to the hotel or hanging with one or two other people, and so he did not engage in much "shop talk" with the others unless absolutely necessary.

(v) *the degree to which the defendant stood to benefit from the criminal activity.*

This Application Note to USSG § 3B1.2 states that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks *should be considered* for an adjustment under this guideline." Further, even a defendant who performs an "indispensable role," may receive an adjustment "if he or she is substantially less culpable than the average participant in the criminal activity." *Id.*

Application Note 3(A) provides more guidance:

> [A] defendant who is accountable under §1B1.3 for a loss amount . . . that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline. For example, a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive an adjustment under this guideline.

USSG § 3B1.2, n. 3(A). There is no question that Mr. Diaz is being held responsible for an amount of loss *far* greater than his personal gain from the offense. While he did not keep records, he was frustrated with the amount of time and risk involved for little compensation. He even considered going off on his own, forming his own group, because he wasn't making enough money. He entertained the idea until he was arrested and prosecuted in Placer County, CA, which is when his involvement in the activity ended.

6

Mr. Diaz was given 50% of the proceeds from a *successful* cash out, but many, many, cloned cards did not work. Mr. Diaz reports that entire trips would be a waste of time. A far cry from the $2.5 million for which he is held responsible under USSG § 2B1.1(b)(1), and truly even lower than the agreed forfeiture amount, Mr. Diaz would estimate he *earned* approximately $50,000.00 over the nine months with the conspiracy (aside from the travel expenses that were covered). Mr. Diaz, therefore, was not buying boats and cars like some co-defendants. In fact, at one point, he did strongly consider going off on his own or having his own "crew" specifically because of how little he was making for the effort and risk he was taking. Thankfully, he was arrested and prosecuted in Placer County, CA, which ended his involvement in the conspiracy as well as his desire to take any additional chances with his freedom.

"Minimal" participation is reserved for those defendants who are "plainly among the least culpable of those involved in the conduct of the group." USSG § 3B1.2, n. 4. A lack of knowledge of scope and structure of the conspiracy is indicate of a "minimal" role. *Id.* "Minor" role is reserved for a defendant "who is less culpable than most other participants. . . , but . . . whose role could not be described as minimal." Mr. Diaz submits that he qualifies for a minimal role adjustment, because he knew only generally the structure of one portion of the conspiracy and had a limited understanding of the scope of that part of the organization. He was unaware of the true scope and structure, however, given that there were two leaders at the time and that the conspiracy was operating in many other areas of the country.

At a minimum, Mr. Diaz would fall between "minimal," and "minor," and therefore qualify for a 3-point adjustment, pursuant to USSG § 3B1.2(b).

b.      USSG § 5K2.0 (Policy Statement) – Departure on Other Grounds

Mr. Diaz' Placer County conviction—for which he served 72 days in jail followed by a term of probation—was part of the relevant conduct of this case. The charge was reduced after successful completion (and in fact early termination) of probation, which required Mr. Diaz to travel to California to report and attend court, which he did without fail. The offense conduct in that case fell squarely in the middle of his nine-month period of participation in the conspiracy, and the very same evidence was teed up to be used against him at trial of this matter. While it's not "double jeopardy," it is not enough to simply not count the prior offense for criminal history purposes without taking into account that there was punishment imposed and served, including lengthy, costly, and complied with, supervision.

Additionally, the guidelines fail to take into account the time between Mr. Diaz' last involvement in the conspiracy (Spring, 2019) and the instant prosecution, during which he has had no interaction with the criminal justice system whatsoever, save having to surrender on the Placer County warrant, of which he had previously been unaware. Most notable is the 3 1/3 years since his successful completion of probation and his arrest for the instant offense, during which Mr. Diaz ran his business, raised his daughter, and supported his family—both immediate and extended. Not only does this run counter to the government's attempt to characterize Mr. Diaz as "undeterred," but it is a far more reliable indicator of risk of recidivism than is the actual conspiracy conduct, let alone unsubstantiated and dismissed charges from nearly a decade ago.

For the reasons set forth above, Mr. Diaz respectfully prays for a four-point adjustment for minimal role, and an appropriate downward departure of at least an additional four points for the circumstances not adequately taken into account, to wit: the

Placer County conviction, sentence served, probation successfully completed; his post-offense conduct, and especially his lack of criminal justice involvement after the successful completion of probation but before his arrest in this case.

## APPLICATION OF THE 3553 FACTORS AND REQUEST FOR VARIANCE

*I.   Nature and Circumstances of the Offense*

Anyone who has woken up to find that while they slept, their checking account was depleted, or their credit card balance was run up, understands the seriousness of this type of offense. Undersigned counsel fell victim to a skimming operation only last Fall and even knowing that the bank would cover the fraudulent charges, the cold chill and dropped stomach of even the temporary loss (and fear that more would be taken) was traumatic. Of course, unlike a violent offender, the defendants in this case weren't trying to inflict trauma on individuals—but Mr. Diaz understands that individual victims were affected in this manner. If the individuals were lucky like counsel was, their money was back in their account or their balances were cleared within a couple of days; but the banks were out the money, and those losses trickle down to consumers who were not even directly affected by the scheme.

The losses in this case, even the fraction for which Mr. Diaz is being held responsible, and even the far smaller fraction that he earned, are a drop in the bucket of the overall losses incurred by fraud victims nation and worldwide each year. With the advent of touchless pay systems and more sophisticated technology, every transaction comes with a degree of risk. But stopping to put gas in your car to go to work shouldn't put someone at risk of losing their money. And of all things, Mr. Diaz now runs a trucking company. When

he imagines that his contractors or employees would, while working for him, fill up and fall victim to this type of scheme, it really hits home for him.

While it is no excuse, and is itself problematic, that "he didn't think about that," it's true. Had Mr. Diaz thought about it, especially given that he is truly a kindhearted and generous man, he would never have done what he did. Today, he understands the seriousness of his actions and his plea and detention in this case are his second attempt to make some amends.

II.     *History and Characteristics of Mr. Diaz*

Mr. Diaz made an awful mistake. It was stupid, short-sighted, dangerous, and illegal. And he has paid a price that is severe. Not only was he prosecuted in California, but years later, well after he completely committed to his fiancé, became a father, and had eleven family members relying on him not to mention employees, he faced not only a second prosecution but imprisonment. It didn't come on the heels of the offense conduct, and it didn't come at a time when no one else would be affected.

Mr. Diaz cries at every single visit with counsel. He speaks to his fiancé every single day. He has video visits with his daughter who, although she is told Daddy is away at school, has not been dealing well with his absence. Mr. Diaz and his fiancé have had to make the difficult choice of either telling a five-year-old her father is in jail or telling her that he had to leave her for other reasons that may seem *to her* as if he's *chosen* to be away. Not surprisingly, she has had marked behavioral issues at school during Mr. Diaz' absence. There is no greater pain than knowing your child is in pain, except perhaps the pain that comes when you can't be there to fix it. *That* is a deterrence, as well.

Prior to his arrest, Mr. Diaz and his fiancé were planning to marry. During pretrial detention, counsel inquired as to the process for him to marry at the Norfolk City Jail. Not only has the U.S. Supreme Court recognized a right to marry, but the Constitution of the State of Florida where Mr. Diaz and his family reside explicitly provides for the right to marry. Nevertheless, after following the procedure of making written requests to the Sheriff, Mr. Diaz was denied because he was "awaiting trial," (Exhibit A). That was not the case; he had already pleaded guilty.

Mr. Diaz only wants to get back to his family. He wants to get married and get back to his daughter and try and make up for the last year she has spent without him. He wants to show his gratitude to his fiancé and employees, and everyone who helped keep his business going in his absence by working as hard as he can to ensure that they do not have to face uncertainty like that again. For all these reasons in addition to the fact that he walked away from criminal behavior six years ago, Mr. Diaz is a very low risk of recidivism.

The letters submitted in support of Mr. Diaz—from family, friends, employees, and colleagues—paint the *true* picture of the man before the Court. *See* Exhibits B-N. The people who wrote these letters know him best and fully. They knew him before, during, and after the offense conduct. They know his heart, his state of mind, and the impact which this case has had on him and those who love and care about him. The letters also illustrate that Mr. Diaz has a wide-ranging and positive impact on many people and will continue to do so. He has a vast support base, which is also a safeguard from recidivism.

   III.   *The Need for Deterrence and Promote Respect for the Law*

The court need not be concerned with specific deterrence in this case. Mr. Diaz will not

break the law again. He did not intend to cause the extended harm his actions undoubtedly caused—not only to individual victims, but also his entire family—and he would never find himself in similar circumstances ever again. General deterrence however, which is of great concern for the United States and possibly for the court, is not achieved by the imposition of substantial incarceration in this case.

Studies have shown that longer sentences are *not* a greater deterrent to criminal behavior. *See* Wright, Valerie. "Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment," (Nov. 2010). For those for whom it matters (i.e., those who would be deterred) the possibility of punishment itself is a deterrence. The Institute of Criminology at Cambridge University found in 1999 that there was no evidence to support the notion that increased sentences resulted in greater deterrence but that there was evidence, from studies of offense rates in particular populations, that the greater the likelihood (or probability) of punishment, the lower the crime rate. *See id.* at 4 *citing* Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P.O. Wikstrom, "*Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*," Oxford: Hart Publishing, 1999. Leading scholars on the subject, Daniel Nagin and Greg Pogarsky, reached a similar conclusion: that "punishment certainty is far more consistently found to deter crime than punishment severity, **and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences**." Wright at 4 *citing* Daniel Nagin and Greg Pogarsky. "*Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*," Criminology, 39(4), 2001 (emphasis added).

Finally, Mr. Diaz is at risk for removal to Cuba—a country from which not only he escaped 15 years ago, but from which he has spent *years* helping family members escape. The

effects of his conviction, therefore, will never be "over," because even as he remains in the U.S., he will be in constant fear and at risk of deportation.

At this point, Mr. Diaz' serving a lengthy prison sentence will not promote respect for the law; quite the opposite. Justice promotes respect for the law. A sentence that is retributive and overly harsh that fails to account for mitigating circumstances and a defendant's history undermines a positive view of the judicial system. Mr. Diaz is not a wealthy man trying to buy his way out of trouble as was often the case in the early days of headline-making white collar cases that spurned the increased guidelines. He also does not come before the court remorseless or feeling entitled. But he is a different man now than he was in 2019, and it is that new man that stands before the Court for sentencing.

IV.   *The Types of Sentences Available and Defendant's Need for Treatment, etc.*

The court can fashion a sentence that provides just punishment, fitting the offense and the offender, without imposing a period of incarceration close to the government's request. Mr. Diaz can and will be on supervision after his release, which allows the Court to keep close tabs on all aspects of his life. Incarceration just locks people away; supervision lets the Court know if the conviction has really had the desired effect.

WHEREFORE, Mr. Diaz respectfully prays that this Honorable Court impose a sentence of eighteen (18) months' incarceration with credit for time served. Such a sentence is sufficient, but not greater than necessary, to achieve the enumerated objectives of sentencing.

    Respectfully submitted,

    LUIS GUSTAVO DIAZ
    By Counsel

THE LAW OFFICE OF LANA MANITTA, PLLC

By: _____/s/_____.
Lana Manitta, VSB #42994
1800 Diagonal Rd., Ste. 600
PMB #1152
Alexandria, VA 22314
(703) 705-4428
FAX (703) 705-4429
LManitta@ManittaLaw.com
Counsel for Luis Gustavo Diaz

RULOFF SWAIN HADDAD MORECOCK TALBERT & WOODWARD, P.C.

By: _____/s/_____.
Lawrence Hunter Woodward, Jr., VSB #21756
317 30th St.
Virginia Beach, VA 23451
(757) 671-6047
FAX (757) 671-6004
LWoodward@srgslaw.com
Counsel for Luis Gustavo Diaz

## CERTIFICATE OF ELECTRONIC FILING/SERVICE

I HEREBY CERTIFY THAT on the 10th day of April 2025, I filed the foregoing with a Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

THE LAW OFFICE OF LANA MANITTA, PLLC

By: _____/s/_____.
Lana Manitta, VSB #42994
1800 Diagonal Rd., Ste. 600
PMB #1152
Alexandria, VA 22314
(703) 705-4428
FAX (703) 705-4429
LManitta@ManittaLaw.com
Counsel for Luis Gustavo Diaz